**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **CHRYSTELE MCKANDES, and MAXINE MCCOLLOUGH,** | |
| **Plaintiffs,** | **Civil Action No. AW-04-743** |
| v. | |
| **CAREFIRST, INC., FREESTATE HEALTH PLAN, INC., and CAREFIRST BLUE CHOICE,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiffs Chrystele McKandes ("McKandes") and Maxine McCollough ("McCollough") (collectively, "Plaintiffs") bring this action against Defendants CareFirst, Inc. ("CareFirst"), FreeState Health Plan, Inc. ("FreeState"), and CareFirst BlueChoice, Inc. ("BlueChoice") alleging violations of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*, and violations of state statutory and common law obligations. In particular, Plaintiffs challenge Defendants' practices of claiming and receiving funds, prior to June 1, 2000, from participants in employee welfare benefit plans and health insurance plans administered by Defendants.

Currently before the Court is Defendants' Motion for Summary Judgment [35]. The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary. See Local Rule 105(6) (D. Md. 2004). For the following reasons, Defendant's Motion for Summary Judgment is granted-in-part and denied-in-part.

**FACTUAL & PROCEDURAL BACKGROUND**

I. **Factual Background**

    A.    Origins of Case

The origin of this case stems from the Maryland Court of Appeals decision in Riemer, supra, where Riemer and others sued Columbia Medical Plan ("CMP"), an HMO of Blue Cross Blue Shield, asserting that CMP was statutorily prohibited from collecting subrogation from its members. The Maryland Court of Appeals held that "an HMO may not pursue its members for restitution, reimbursement or subrogation after the members have received damages from a third-party tortfeasor." Riemer, 35 Md. at 258. In response to the holding of Riemer, the Maryland legislature enacted a statute, amending the Maryland HMO Act, to provide that an HMO is authorized to pursue subrogation with respect to members' recoveries from third parties. 2000 Md. Laws ch. 659 (enacting Md. Health Gen. Code Ann. § 19-713(d) effective June 1, 2000). That legislation provided that it would apply retroactively to all subrogation recoveries by HMOs. Id. In Harvey v. Kaiser Foundation, 370 Md. 604 (2002), the Maryland Court of Appeals declared retroactive sections of the HMO Act unconstitutional. Consequently, as Maryland law now stands, the subrogation prohibition of the HMO Act remained applicable to actions occurring prior to June 1, 2000.

    B.    Chrystele McKandes

The following facts are taken in the light most favorable to Plaintiff. McKandes, an employee of the Prince George's County, Maryland ("PG County") public schools, received health care benefits through a welfare benefit plan provided by the PG County public schools. As part of her welfare benefit plan, McKandes was a member of the CapitalCare HMO, which is now known as BlueChoice.

On March 3, 1999, McKandes was injured in an automobile accident, and McKandes received medical treatment in conjunction with that accident. Following McKandes's accident, a company calling itself CareFirst BlueCross BlueShield ("CareFirst")[1] asserted that it had its own independent right of subrogation against McKandes for medical benefits that it claimed to have provided. On April 14, 1999, McKandes received a letter stating that "[u]nder the subrogation provision of our contract . . . CareFirst BlueCross Blue Shield [] has the right of recovery . . . for benefits we have paid . . ." On April 16, 1999, McKandes liability attorney received a similar letter confirming that the attorney would "represent the right of subrogation of CareFirst BlueCross BlueShield [] for Chrystele McKandes." On August 20, 1999, McKandes's attorney received another letter, this one stating that CareFirst "has provided benefits for medical expenses incurred by Chrstele McKandes as a result of the injury sustained on March 3, 1999." On September 14, 1999, McKandes recovered $5,000.00 from the Government Employees Insurance Company to resolve a tort claim arising from her auto accident. McKandes ultimately paid $183.37 in subrogation to CareFirst out of the proceeds of her settlement.

C.   Maxine McCollough

McCollough, an employee of Sibley Memorial Hospital ("Sibley"), received health care benefits through a welfare benefit plan sponsored by her employer. Similar to McKandes, McCollough was injured in an automobile accident. On June 5, 1998, McCollough received a payment in settlement for her tort claims arising out of that accident. In response to subrogation liens asserted by CareFirst, McCollough

---

[1] According to the record, CareFirst BlueCross BlueShield is the trade name by which CareFirst and its various affiliates conduct business. For the sake of simplicity, the Court will refer to both aforementioned entities as "CareFirst."

paid $109.00 out of her settlement proceeds to pay off the subrogation lien.

II.     **Procedural Background**

On May 31, 2000, McKandes, as the sole named plaintiff, initially filed suit on behalf of a class of allegedly similar situated individuals, in the Maryland Circuit Court for Prince George's County against a single Defendant named "Blue Cross Blue Shield Association." McKandes then filed a First Amended Complaint, adding two Defendants: Group Hospitalization and Medical Services, Inc. ("GHMSI") and Capital Care, Inc.

On December 26, 2000, this case was removed for the first time to this Court and subsequently stayed on stipulation of the parties. On January 30, 2003, this Court granted Plaintiff leave to file her Second Amended Complaint,[2] and concluded in a Memorandum Opinion that McKandes claims were not completely ERISA preempted, and remanded this action back to state court.

Back in state court, on March 26, 2003, Plaintiffs filed their Third Amended Complaint. McKandes remained as a Plaintiff, and two new named Plaintiffs joined the action: McCollough and Erdye Johnson. Plaintiffs dropped "Blue Cross and Blue Shield Association" as a Defendant, and continued the action against the other four Defendants.

On October 9, 2003, Plaintiffs filed a Fourth Amended Complaint. Johnson was dropped as a Plaintiff, leaving McKandes and McCollough as the only named Plaintiffs. Also, Plaintiffs maintained CareFirst and FreeState as Defendants but dropped PHN. Plaintiffs also added Delmarva Health Plan,

---

[2] The Second Amended Complaint changed the Defendants. "Blue Cross and Blue Shield Association" remained as a Defendant, but GHMSI and Capital Care were no longer Defendants. McKandes also added four new Defendants: CareFirst, FreeState, CareFirst BlueChoice, Inc. ("Blue Choice"), and Preferred Health Network of Maryland, Inc. ("PHN").

4

Inc. and Healthcare Corporation of the Mid-Atlantic as Defendants.

In state court, Plaintiffs moved for class certification before Hon. William B. Spellbring, Jr. Following two days of hearing, on November 26, 2003, the state court denied class certification in a full decision from the bench.

On February 13, 2004, following the denial of class certification, Plaintiffs filed their Fifth Amended Complaint in state court asserting for the first time claims arising under ERISA.[3] Plaintiffs Count I and Count II of the Fifth Amended Complaint alleged denial of ERISA benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and for an alleged violation of an ERISA plan pursuant to 29 U.S.C. § 1132(a)(3). Specifically, Plaintiffs allege that they are entitled to receive the full amount of covered medical services free of any claim by Defendant for subrogation of, or reimbursement for, any recoveries from Third Party tort claims. Because these claims presented questions of federal law, Defendants removed this action on March 12, 2004, pursuant to 28 U.S.C. § 1441 to this Court. Since this action was first remanded to state court, the Fourth Circuit decided Singh v. Prudential Health Care Plan, Inc., 335 F.3d 278 (4th Cir.), cert denied, 124 S.Ct. 924 (2003) (affirming removal based on complete preemption under ERISA in a case involving essentially identical claims brought by the same Plaintiffs' attorney against a different health insurance company). In the aftermath of Singh, it is clear that such claims provide a proper basis for removal.

## STANDARD OF REVIEW

Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S.

---

[3] The Fifth Amended Complaint was brought by McKandes and McCollough, but Defendants Delmarva Health Plan, Inc. and HealthCare Corporation of Mid-Atlantic were dropped as Defendants.

317, 324-25 (1986). Once the moving party discharges its burden by showing there is an absence of evidence to support the nonmoving party's case, Catrett, 477 U.S. at 325, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## DISCUSSION

### I. Plaintiffs' Self-Funded Plans Provide HMO Coverage Under Riemer & HMO Act

A. Assuming Plaintiffs' were Members of Self-Funded or ASO Health Plans

In Riemer, the Maryland Court of Appeals emphasized that Maryland HMOs are prohibited from engaging in subrogation. Specifically, the Maryland Court of Appeals held that:

> pursuant to sections 19-701(f) and 19-710(b) and (o) of the Health-General Article, and the general statutory scheme of Maryland's Health Maintenance Organization Act, an HMO may not pursue its members for restitution, reimbursement, or subrogation after the members have received a financial settlement from a third-party tortfeasor, any contract to the contrary notwithstanding.

Riemer, 358 Md. At 233. In the instant case, this Court is called upon to decide, *inter alia*, whether in Riemer the Maryland Court of Appeals created an exception for HMOs providing third-party administrative services to self-funded health plans or whether HMOs can collect subrogation from members who participate in self-funded plans.

Defendants seek summary judgment on the ground that neither Plaintiff has a viable claim under Riemer and the Maryland HMO Act. In particular, Defendants contend that neither McKandes nor McCollough made any subrogation payment as a member of a Maryland HMO. Instead, Defendants

contend that both McKandes and McCollough were participants in self-funded or administrative services only ("ASO") plans under which their employers or the plan sponsors — not Defendants — assumed the claim risks of plan participants and also benefitted from the subrogation recoveries.

In contrast, Plaintiffs contend that summary judgment is improper because the Maryland HMO Act applies to all HMOs, whether their plans are fully insured or self-funded. Specifically, Plaintiffs argue that because Defendants were HMOs certified to operate in Maryland, the HMO Act and <u>Reimer</u> prohibits Defendants from subrogating, regardless of the types of health services they provided. This Court agrees with Plaintiffs.

This Court's analysis begins first with the plain language of the HMO Act. Section 19-701(f) of the Health-General Article defines a HMO as:

> any person, including a profit or nonprofit corporation under the laws of any State or country, that:
> (1) Operates or proposes to operate in this State;
> (2) Except as provided in § 19-703(b) and (f) of this subtitle, provides or otherwise makes available to its members health care services that include at least physician, hospitalization, laboratory, X-ray, emergency, and preventive services, out-of-area coverage, and any other health care services that the Commissioner determines to be available generally on an insured *or prepaid basis* in the area serviced by the health maintenance organization, and, at the option of the health maintenance organization, may provide additional coverage;
> (3) Except for any copayment or deductible arrangement, is compensated *only* on a predetermined periodic rate basis for providing to members the minimum services that are specified in item (2) of this subsection . . . [Emphasis added].[4]

Additionally, the HMO Act requires any entity seeking to operate as an HMO to obtain a

---

[4] Pursuant to section 19-701(f)(3), HMOs are only permitted to receive compensation from their subscribers in one of three forms: co-payments, deductibles, and a pre-determined and prepaid periodic fee. Here, the only form of compensation at issue is a pre-determined and prepaid periodic fee.

certificate from the Maryland Insurance Commissioner identifying the entity as an HMO. Md. Code, Health-General, § 19-710(b). The HMO Act further states that "An HMO may not . . . fail to fulfill the basic requirements to operate as a health maintenance organization as provided in § 19-710(b). . ." Id. § 19-729. Most importantly, section 19-710(b) provides explicitly that "the applicant [for a certificate to operate as an HMO] *shall* conform *to the definition* of a health maintenance organization." Id. § 19-710(b).

Based on the plain language, the entire statutory scheme emphasizes that an HMO, by its definitions, provides health care services on a *prepaid* basis. Additionally, section 19-710(b) expressly contains a requirement that HMOs conform to the definition of an HMO. Evidently, the Maryland Legislature determined that an HMO may collect or attempt to collect payment, other than periodic payment, from a subscriber only in the rare situation when the HMO has paid a provider for an uncovered nonemergency service. Thus, the Maryland Legislature appears to have recognized that, absent this extraordinary circumstance, an HMO could not seek such reimbursement from a member.

The Maryland Court of Appeals in Riemer appears to support this reading of the HMO Act. In particular, the Court stated:

> Section 19-710(b), as we have said, requires HMOs to 'conform' to the definitions. This combination of mandatory provisions emphasizes the legislature's intent to have an HMO act as an HMO. Not only did it define mandatory characteristics of an HMO, *it enacted an additional provision requiring HMOs to conform to those definitions and enacted another section demonstrating that noncompliance with the basic definition of an HMO was prohibited* and subject to penalties under section 19-730 of the Health-General Article.

Riemer, 358 Md. at 241 (emphasis added). In other words, the purpose of the HMO Act is to ensure that "an HMO act[s] as an HMO." Id.

8

As applied here, it is undisputed that Defendants at all times retained their status as HMOs certified to operate in Maryland. As an HMO certified to conduct business in Maryland, Defendants were required to conform to the definition of an HMO and may not violate any aspect of the HMO Act. Based on the language of Riemer, this means that Defendants, as HMOs, were not able to pursue its members for restitution, reimbursement, or subrogation after the members have received a financial settlement from a third-party tortfeasor. This Court finds that the plain language of the HMO Act nor Riemer provide any exceptions for HMOs providing third-party administrative services to self-funded health plans. Nor does this Court find any exception for HMOs collecting subrogation from members who participate in self-funded plans. Indeed, the purpose of the HMO Act was "to limit the nature of compensation of *entities* seeking certification as [HMOs]." Id. at 239.

In short, this Court finds that, pursuant to section 19-710(b), Defendants were required to conform to the statutory definition of an HMO. The statutory definition, in conjunction with the holding in Riemer, includes a prohibition on collecting subrogation monies. Therefore, this Court concludes that Riemer and the HMO Act apply to self-funded health plans administered by Defendants.

Defendants also argue that Riemer is inapplicable to them because Plaintiffs' employers — rather than Defendants — assumes all risks for Plaintiffs' health care costs. This argument is unpersuasive. In particular, the Court notes that Defendants have failed to submit any evidence in the record indicating that Defendants do not bear this form of risk when administering self-funded plans. Moreover, even assuming Defendants acted as a third party administrator that assumed no risk for Plaintiffs' health care costs subrogation is improper. The doctrine of subrogation has been defined as "a legal fiction permitting an insurer to assume the rights of the insured — and to recover for the wrongful acts of a third party against

9

the insured — where the insurer has paid the insured for loss under the contract of insurance." Lexington Ins. Co. v. Balt. Gas & Elec. Co., 979 F.Supp. 360, 362 (D. Md. 1997). The doctrine has been explained as "[o]ne who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation has not been made." United States v. Munsey Trust Co., 332 U.S. 234, 242 (1947). Here, if Defendants neither bore any risk for Plaintiffs' health expenses, nor paid off Plaintiffs' debt, then Defendants lacked any right to subrogate because they never stood in Plaintiffs' shoes. Accordingly, since the employer bore all risk for Plaintiffs' health care, any right of subrogation belongs to Plaintiffs' employers rather than Defendants.

Defendants also argue that Riemer is inapplicable because they never received periodic pre-determined fees to cover Plaintiffs' health services. This Court, however, finds that a genuine factual dispute exists as to whether Defendants receive a periodic fee from Plantiffs' employers for administering self-funded plans. The record shows that when CareFirst and/or its HMO subsidiaries administered self-funded plans on behalf of employers, Defendants had the employers make regular periodic payments to Defendants. These payments were usually made on either a upfront basis or on a negotiated schedule. Although the record indicates that this payment is different from a premium, an upfront or negotiated fixed payment to cover an uncertain amount of future medical expenses is the type of "pre-determined and prepaid periodic fee" prohibited by Riemer. See Riemer, 358 Md. at 237 ("A pre-determined periodic premium is a fixed payment for a specific amount of time, which is paid in advance for potential health care needs."). Thus, this Court finds a genuine factual dispute concerning whether Defendants received periodic pre-determined fees as payment for Plaintiffs' health care costs.

B.  Genuine Dispute on Whether Plaintiffs' Plans are Self-Funded

As stated above, section A demonstrates that summary judgment is improper even if Plaintiffs were members of self-funded or ASO health plans. As an entirely separate matter, this Court finds that summary judgment should be denied on the grounds that a genuine factual dispute exists as to whether Plaintiffs' plans are actually self-funded.

*i.   Dispute of Fact Exists on Whether McKandes Belonged to Self-Funded Plan*

Defendants argue that McKandes was a member of a self-funded health or ASO plan offered by her employer Prince George's County. In particular, Defendants contend that the Prince George's County Board of Education plan to which McKandes belonged was an "administrative services only" or "ASO" plan that was self-funded by the Board of Education. This Court cannot agree.

Defendants' assertion appears inconsistent with the letters sent to McKandes and her tort liability attorney. The record shows that letters sent by CareFirst to McKandes, and her liability attorney, demonstrate that CareFirst was asserting its own right of subrogation on monies received by McKandes from her tort settlement — not that it was acting on behalf of Prince George's County. In an April 14, 1999 letter to McKandes, a CareFirst representative wrote "CareFirst BlueCross BlueShield (CareFirst) has the right of recovery" in subrogation "for benefits we have paid." The letter also urged McKandes to have her attorney contact CareFirst so that "[CareFirst] may protect our rights of subrogation." On April 16, 1999, the same CareFirst representative wrote McKandes's attorney confirming that he would "represent the right of subrogation of CareFirst BlueCross BlueShield (CareFirst) for Chrystele McKandes." Additionally, on August 20, 1999, the same CareFirst representative wrote again to McKandes's attorney stating that its subrogation lien, not the subrogation lien of McKandes's employer,

11

was $244.50. Based on Defendants' own representations, it appears that Defendants were not seeking to collect subrogation on behalf of Plaintiffs' employers, but for their own benefit and profit.

Moreover, CareFirst's August 20, 1999 letter suggests that CareFirst acted as an insurer of McKandes's health care benefits. In that letter, CareFirst stated that *it* provided the benefits for the medical expenses incurred by McKandes as a result of her accident. Thus, these letters raise a genuine factual dispute as to whether CareFirst acted as McKandes's insurer, as the benefits provided by CareFirst.

### ii. *Factual Dispute as to Whether McCollough Belonged to Self-Funded Plan*

Defendants also argue that the Maryland HMO Act is inapplicable to McCollough's claims because she was a member of a self-funded plan. In particular, Defendants contend that McCollough's health benefits plan was self-funded by her employer, Sibley Memorial Hospital, with administrative services only provided by GHMSI. This argument is unpersuasive.

The record shows that the IRS-5500 form that Sibley submitted to the Internal Revenue Service and the Department of Labor, pursuant to the requirements of ERISA, states that McCollough was a member of an insured plan. That form states that Sibley's health plan was not self-funded, but was fully insured by Defendants. Indeed, in line 11 of the IRS-5500 form, Sibley marked the number 3 to describe its plan funding arrangement code. According to the 1998 instructions for Form 5500, the number 3 denotes that the plan was funded by insurance rather than through a self-funded employer trust. This evidence in Sibley's IRS-5500 Form directly contradicts Defendants' evidence that McCollough was a member of a self-funded plan.

Moreover, on line 12 of its 5500 form, which asks for the plan "benefit arrangement" code, Sibley

again marked "3." The 5500 instructions explain that the "benefit arrangement" is the method by which benefits were actually provided during the plan year to participants by the plan. In other words, if all participants received their benefits from a trust the plan's benefit arrangement code would be "1" . . . If all benefits were paid from an account or policy of an insurance company, the code would be "3." If Sibley's plan were self-funded, then the appropriate marking would have been "1." Thus, the fact that Sibley marked "3" in line 12 means that its employees, including McCollough, received benefits through health insurance provided by Defendants. Therefore, a factual dispute exists as to the nature of McCollough's health care coverage, i.e., whether McCollough belonged to an insured health plan or a self-funded plan.

Defendants also argue that McCollough is not a member of the class of Plaintiffs because the class definition excludes members of self-funded ERISA plans. The class definition in the Fifth Amended Complaint carves out all claims brought by "plan participants or beneficiaries who are or have been members of Defendant through ERISA welfare benefit plans that are self-funded within the meaning of 28 U.S.C. § 514(b)(2)(B)." Thus, Defendants contend that this definition describes the Sibley plan to which McCollough belongs, and she therefore has excepted herself from this action. This Court cannot agree. As stated above, a genuine dispute exists as to whether McCollough's plan is self-funded because her plan is not an ERISA plan.[5]

    C.    McCollough Sued the Proper Party

---

[5] As Defendants point out, McKandes received her health benefits from a government entity — Prince George's County. ERISA does not apply to employee benefit plans that are governmental plans. 29 U.S.C. § 1003(b)(1); see also 29 U.S.C. § 1002(32) (defining "governmental plan" to include plans established or maintained by a state or political subdivision of a state). Because ERISA is inapplicable to state government employees, McKandes fits within the class definition.

Defendants also allege that McCollough's claims fail because she has not sued the proper Defendant. Specifically, Defendants argue that McCollough should have sued GHMSI because, according to Sibley's Administrative and Claims Services Agreement, GHMSI was the only entity involved in providing McCollough's health care benefits. Again, this Court cannot agree.

First, the IRS-5500 form filed by Sibley demonstrates that CareFirst is a proper Defendant. The first Schedule A attached to that form states that the health benefits provided to Sibley's employees, including McCollough, were insured by "CareFirst Blue Cross Blue Shield." This indicates a genuine factual dispute as to whether CareFirst and/or its HMO subsidiaries provided McCollough's health insurance rather than GHMSI.

Second, the only evidence Defendants cite in support of their allegation — Sibley's Administrative and Claims Services Agreement — is inapplicable to McCollough's claim. The record shows that the aforementioned agreement was not signed, and did not go into effect, until March 27, 2000, well after McCollough suffered her injury and paid her subrogation lien. Although the Agreement states that the Agreement's effective date is May 1, 1997, the Agreement could not have gone into effect before it was signed by Sibley on March 27, 2000. Because all events related to McCollough's claims occurred prior to signing, this Court cannot find evidence of the Agreement dispositive.

**II.    Plaintiffs' Claims Against Defendants CareFirst or FreeState**

Defendants argue that Plaintiffs lack standing to proceed against Defendants CareFirst and FreeState because of their lack of connection to either individual Plaintiff. It is undisputed that of the current three Defendants BlueChoice has a conceivable connection to the two Plaintiffs because it is a successor of Capital Care. Defendants, however, submit that CareFirst is an overarching holding company

that cannot have liability to either Plaintiff and that FreeState is an HMO with its origins and operations entirely in the separate central Maryland business.

In contrast, Plaintiffs contend that Defendants' argument that Plaintiffs lack standing to proceed against CareFirst and FreeState should be rejected because all three Defendants are tied together under the doctrine of juridical link. Plaintiffs argue that the juridical link doctrine is particularly appropriate here because each entity that potentially had a health care relationship with Plaintiffs was controlled by CareFirst. In particular, Plaintiffs contend that since January 1, 1998, both the CapitalCare HMO (now BlueChoice) and the FreeState HMO (now subsumed into BlueChoice) have been under the common ownership and control of CareFirst and have enforced a common policy of subrogation. Because this Court concludes that the doctrine of juridical link applies to Rule 23 class actions, and is not a doctrine of standing, the Court finds Plaintiffs' argument unpersuasive.

Juridical link doctrine "answers the question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only [one defendant] can also sue the other defendant under the guise of class certification." In re Eaton v. Vance Corp. Sec. Litig., 220 F.R.D. 162, 165 (D. Mass. 2004). The juridical link doctrine arose out of the Ninth Circuit's decision in La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973). In La Mar, the Ninth Circuit held that a plaintiff without a cause of action against a specific defendant cannot "'fairly and adequately' protect the interests of those who do have such causes of action," for purposes of Rule 23(a). Id. at 466 (citations omitted). Nevertheless, and relevant to this case, the Ninth Circuit went on to hold that if the plaintiffs as a group- named and unnamed-have suffered an identical injury at the hands of several parties by way of a conspiracy or concerted scheme, or otherwise "juridically related in a manner that suggests a single resolution of the

dispute would be expeditious," the claim could go forward. Id.

The Fourth Circuit has addressed juridical link doctrine only tangentially, in a single, unpublished opinion, Faircloth v. Fin. Asset Sec. Corp. Mego Mortg. Home Owner Loan Trust, 87 Fed.Appx. 314 (4th Cir. 2004), stating that the court "ha[s] yet to recognize" the doctrine, and in the alternative, "even were we to recognize the juridical link doctrine as a basis for standing, [plaintiff] could not invoke it successfully." This Court has recently rejected its application in the context of conferring standing. Popoola v. Md-Individual Practice Assoc., __F.Supp.2d __, 25 WL 1961342 * 8 (D. Md. 2005) ("The short answer to this argument is that the juridical links doctrine has no bearing on the issue of standing. Instead, it provides an exception to the Rule 23(a) requirement of typicality and/or adequacy of representation in class actions against multiple defendants."); see also Eaton Vance, 220 F.R.D. at 169 ("In its infancy, the [juridical link] doctrine had nothing to do with Article III standing. In fact, Le Mar was a case where standing was not at issue because the Ninth Circuit assumed it to exist."). As this Court has previously warned, "while juridical link doctrine may be 'expeditious,' Article III standing . . . does not often bend to expediency and the Supreme Court has warned against such an approach," Id. at (citing Raines v. Byrd, 521 U.S. 811, 820 (1997) (Article III standing analysis cannot be abandoned "for the sake of convenience and efficiency")), and agrees that "the juridical link doctrine should be confined to an analysis of Rule 23(a)." Id. Accordingly, this Court finds that the doctrine of juridical link applies to the context of Rule 23 class actions, and therefore does not apply to Plaintiffs' individual claims.

Moreover, this Court finds that Plaintiffs lack standing to proceed against Defendants CareFirst and FreeState because neither CareFirst nor FreeState has exhibited a connection to either Plaintiff. The record shows that before 1998, the two Blue Cross and Blue Shield licensees in the area — GHMSI in

16

the National Capital Area and BlueCross and Blue Shield of Maryland, Inc. in central and other areas of Maryland — were completely separate, with no ownership or operational affiliations. Effective in January 1998, GHMSI and BlueCross BlueShield combined with the creation of CareFirst, as a holding company over both sides of the business. GHMSI continued, and BlueCross BlueShield became CareFirst. It is undisputed, however, that CareFirst is an overarching holding company that could not conceivably have any liability to either Plaintiff. Additionally, it is undisputed, and the record shows, that Plaintiffs' claims arose from the National Capital Area or GHMSI side of the business and that FreeState was entirely on the separate Maryland side of the business. Accordingly, this Court finds that Plaintiffs have failed to show that either Plaintiff could pursue any recovery from CareFirst or FreeState, and therefore Defendants CareFirst and FreeState are entitled to summary judgment.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED-IN-PART and DENIED-IN-PART. Specifically, this Court GRANTS summary judgment in favor of Defendants CareFirst and FreeState, and therefore those Defendants are dismissed, and the Court DENIES summary judgment as to individual Defendant Blue Choice. An Order consistent with these rulings shall follow.

August 31, 2005 / /s/
Date                                                                      Alexander Williams, Jr.
                                                                          United States District Judge